## No. 8763.

### NUCCI v. COLORADO & SOUTHERN RAILWAY COMPANY.

CONTRIBUTORY NEGLIGENCE—*Traveler at Railway Crossing*. The failure of a railway company to sound the whistle or ring the bell, on approaching a highway crossing, does not relieve the traveler of the duty to look and listen, before attempting to pass. If from the first point of view observation is obstructed, the traveler as he passes to the intersection must again look, where a view may be had. A traveler who attempts to cross a railway without this precaution, where observation is practicable and no affirmative act of the railway company creating an appearance of safety is shown, must be declared negligent. The evidence examined and the action of the court below directing a verdict for defendant approved. The circumstance that the railway 'crosses another very near to the highway crossing and that under Rev. Stat. sec. 5499, the train was required to come to a stop, was held immaterial.

*Error to Denver District Court, Hon. J. E. Little, Judge.*

Mr. F. W. SANBORN and Mr. GEORGE ALLAN SMITH, for plaintiff in error.

Mr. E. E. WHITTED and Mr. THOMAS R. WOODROW, for defendant in error.

Chief Justice White delivered the opinion of the court.

IN a suit by Nucci against the Colorado & Southern Railway Company, in damages for injuries sustained by him through the alleged negligence of the defendant, he was non-suited and brings the case here for review. The negligence of the defendant in failing to ring its bell, or blow its whistle, is conceded, and the sole question presented for determination is whether the plaintiff, on the undisputed facts, was guilty of contributory negligence. The damages were caused by a freight train striking the plaintiff while he was attempting to cross defendant's railroad tracks with his team and wagon. The acts of negligence alleged were excessive and dangerous rate of speed of the train, and failing to ring the bell or blow the whistle, on approaching the crossing where the accident occurred.

The defendant's road runs in an easterly and westerly direction at this point. The highway along which plaintiff was driving runs in a northeasterly and southwesterly direction, and plaintiff was approaching the crossing from the southwest. Parallel with the highway, and approximately 30 feet west of it, are the tracks of the Denver & Rio Grande Railroad. For some distance west, the track of the defendant is on a down-grade to the crossing where the accident occurred, and thence east on an up-grade. The train that injured the plaintiff came from the west. In the angle formed by the defendant's roadbed and the highway upon which plaintiff was traveling, are some cottonwood trees which, to some extent, obstructed the view of the track to the west. These trees, however, are 180 feet southwest of the intersection of the highway and the track. The only obstruction between the cottonwood trees and the crossing intersection, is some small willow trees which are 17 feet from the south rail of the defendant's track, and 120 feet southwest of the crossing intersection. The distance between the willow and cottonwood trees is 60 feet. A map, prepared by defendant and introduced in evidence by plaintiff, shows that from any point on the wagon road 25 feet south from the crossing where the accident occurred, there is an open and unobstructed view along the track, and the right-of-way of defendant's road, west, for a distance of 432 feet from such crossing; and from a point on the highway 120 feet south of such crossing there was an unobstructed view, with the exception of the small willow trees heretofore referred to, for a distance of 532 feet west along such track and right-of-way. To the end that there be no misunderstanding of the matter, we here insert a photograph of the scene of the accident, made by defendant and introduced in evidence by plaintiff.

A memorandum on the back of the photograph states that the photographer making it stood at a point 250 feet west of the center of the crossing, and that the man shown therein stood 30 feet south of the center of the track. It

will be observed that there is considerable open view disclosed by the photograph, perhaps 10 feet, to the south of where the man is shown, notwithstanding the trees were in full foliage. Plaintiff lived in the vicinity, and was perfectly familiar therewith and had traveled over the highway and crossing of the railroad where he was injured, two or three times a week for fifteen years. He testified concerning the accident, as follows "About thirty yards from the track I stopped my horses and looked and listened to see if a train was coming. The whistle did not blow, or the bell ring. I neither saw nor heard a train. I did not see the train coming. I was in the middle of the track when the train struck me." And further, on cross-examination "I did not see the train until it struck me. Q. When you were right on the track just at the time you were struck, which way were you looking? A. I was looking where to go home. Q. Looking along the road in the direction of your home? A. I was looking the road." And again: Q. Well, you mean you did not know about the train, isn't that it? A. I meant to say I looked for the train, and I did not see nothing as I stated before, and things I say once I know I do not need to say fifty times. Q. Where was this point that you looked, where were you when you looked for the train? A. Thirty yards away." And again "Q. You are absolutely sure you did not look at any point except where you have told me, thirty yards from that track? A. No, I did not look no other place. Q. How high were these trees that were out there by that point, thirty yards from the track? A. I do not know how high they are because I did not measure them. They are high enough, I can't see through it. Q. They were so high and broad that it cut off your vision in the direction that the train was approaching? A. I could see nothing. Q. There were no holes through the trees, I mean no apertures between the trees that you could see through at that point? A. No. Q. Big, solid clump of trees that you couldn't see through, no matter how long you looked? A. No, I couldn't see. Q. Are you just as positive that

the trees were between that point and the approach of the train? A. I do not know any thing about it, you can ask me all the questions you want to, I cannot see the train for the trees." On re-direct-examination: "Q. Is there a place through the trees about thirty yards from the track where you could see up the track? A. I could see nothing. Can't see nothing. Q. What did you stop for? A. To look and see if any train was coming. Q. And you did not see any train coming, is that what you mean? A. Yes. Q. Is there an opening in the trees where you could see a train, if the train was on the track? A. There was no opening at all, it was all forest in there of trees. Q. Then what did you stop for, to look? A. To look. Q. What did you stop to look for if you couldn't see? A. Sometimes you can hear the train whistle. Sometimes you don't see but you can hear the train whistle."

After some colloquy between court and counsel, the witness, without being interrogated, continued: "You get within about fifteen feet of the track before you get beyond the trees and can see down the track." Counsel for plaintiff resumed his interrogation of the witness: "Q. When you got fifteen feet from the track did you look to see if a train was coming? A. Yes. It is about fifteen feet from the horses' heads to where I sat in the wagon. When you are fifteen feet away from the track I believe the heads of the horses are about at the rail." Witness further testified that the trees were about thirty to thirty-three feet to the west of the highway along which he was traveling, and then being interrogated by defendant's attorney, testified as follows: "Q. Mr. Nucci, have you talked this matter over with your lawyer since last night? A. Yes. Q. You have got pretty well straightened out now how you want to testify, have you? A. Yes. * * * Q. You said yesterday that the team went on the track in a slow trot, is that true? A. Yesterday I did not understand. Q. Do you understand today? A. I believe I do understand. When I got within thirty yards, I stood up and looked around to see if any train is coming. From

that point the horses were walking slow, maybe one and one-half miles an hour. Yes, faster, sure, than a man can walk. Q. Are you absolutely sure that you did not see the train until it struck you? A. When it struck me is the time I saw the train. Q. Didn't you see it before it struck you? No, I didn't see it. I think the train hit between the horses and the wagon. * * * Q. Do you remember anything at all about the case except what your lawyer told you? A. Only what the attorney told me." Plaintiff, in answer to questions propounded by his own attorney, further testified: "Q. Some thirty yards or so from the crossing can you see the railroad track through the trees? A. I could see. Q. You said you could see the railroad track from thirty yards from the crossing? A. Yes, I could see. Q. How far up the track could you see there from the crossing? A. About 180 or 200 feet, something like that." And thereupon, being re-cross-examined, testified: "Q. That means that you could have seen from that point, one hundred and eighty feet up the track from the highway crossing? A. I could see; but I looked that day but I did not see nothing. I could see I guess about 180 feet from the crossing. Could not see further on account of trees. Q. So the trees were further than the 180 feet away from the crossing? A. Something like that."

We are of the opinion that plaintiff is not in a position to complain of the action of the court in entering a nonsuit. It is clear from the undisputed facts that his own negligence contributed to his injury, and no other inference could be properly drawn therefrom. The effect of the facts of this case is the same as that in the case of Headley, et al. v. Denver & Rio Grande Railroad Co., 60 Colo. 500, where the authorities, involving the question of contributory negligence in cases of injury sustained through accidents at railway crossings, are reviewed and the law applicable thereto declared. That decision makes clear the distinction between mere negligence on the part of the railway company, and affirmative acts committed by it, which create a condition of apparent safety. There,

as in the case at bar, the negligence of the defendant was certain, but, as therein held, that in no wise relieved the party injured from taking ordinary precaution for his own safety. Plaintiff does not claim that the defendant was guilty of any affirmative act which created an appearance of safety at the crossing, or which tended to throw him off his guard or to lull him into a false sense of security. While it is not mentioned in the original briefs, attention has been called, in conference, to the fact that the record discloses that the tracks of the Denver & Rio Grande Railroad cross the tracks of the defendant company at a point about 30 feet west of the highway crossing where the accident occurred, and as § 5499, Revised Statutes of 1908, requires every train, on approaching the crossing of the tracks of another railroad, to stop and to cross such tracks at a speed not exceeding 4 miles per hour, the failure of defendant to do so in the instant case was negligence *per se* on its part. This has nothing to do with this case, for the simple reason that defendant's negligence is conceded and the failure in question establishes only the fact of negligence. It in no wise constitutes an act on defendant's part creating a condition of apparent safety. Moreover, there is no claim upon the part of plaintiff that he was relying upon defendant stopping its train at the crossing. In fact, it is stated by defendant, in brief on motion for rehearing, and not denied by plaintiff, that the Rio Grande track at this place was only a switch, and had been abandoned for many years prior to the accident, which fact was known to both sides of the controversy, at and prior to the trial, and that no issue in relation to the same was raised at the trial.

So the sole question is, was plaintiff negligent, and did his negligence contribute to the injury. It is established by an early decision of this court that a traveler approaching a public highway in the country, is charged with the duty of knowing that others may be negligent, and that he must act accordingly. *C., B. & Q. R. R. Co. v. Campbell,* 34 Colo. 380, 83 Pac. 138, 7 Ann. Cas. 987. It is equally

well established that the failure of the defendant to whistle or ring its bell did not relieve plaintiff of his duty to look and listen for the approaching train, and that such duty is not discharged by observation made at a point where obstructions make it impossible to ascertain if a train is approaching, where, after passing such obstruction, he could by looking and listening satisfy himself whether it is reasonably prudent to attempt to cross the line.

*Colo. & Sn. Ry. Co. v. Sonne,* 34 Colo. 306, 83 Pac. 383; *Colo. & Sn. Ry. Co. v. Thomas,* 33 Colo. 517, 81 Pac. 801, 7 L. R. A. 681, 3 Ann. Cas. 300; *C., R. I. & P. Ry. Co. v. Crisman,* 19 Colo. 30, 34 Pac. 286.

Plaintiff testified several times very positively that he did not look for a train after passing the obstruction. In fact, that he only looked when he was 30 yards away from the crossing and that it was impossible to see at that point because the trees were so thick it was impossible to see through them. It may be said, however, that there is a statement in his testimony that he did look when about 15 feet from the track before going on the same, but did not see the train. He further testified, however, that "when you got within about that distance of the track you got beyond the trees, and can see down the track." The trial court expressly rejected the statement, that he looked but could not see, as incredible and under the authorities he was required so to do. The law is well settled in this jurisdiction that when the evidence clearly shows that if plaintiff could have seen the train had he looked, his statement that he did look, but did not see, raises no conflict of evidence to be solved by the jury. *Westerkamp v. C., B. & Q. R. R. Co.,* 41 Colo., 290, 296, 297, 92 Pac. 687. It follows that the opinion heretofore rendered herein by a department of this court must be withdrawn, the decision set aside, and the judgment of the trial court affirmed; and it is so ordered.

Judgment affirmed.

Decision *en banc.*

Mr. Justice Hill, Mr. Justice Scott and Mr. Justice Teller dissent.

Scott, J., dissenting.

I must dissent from the majority opinion. By the authority of a long line of decisions by this court the case should have been submitted to the jury upon the testimony produced, and there is in my opinion, no case decided by the court that supports the conclusion of the majority.

It is said that the effect of the facts in this case is the. same as in the case of *Headley v. D. & R. G. R. Co.*, 60 Colo., 500, 154 Pac. 731. The effect of the facts in any law case is generally to be determined by the jury. But there is no similarity in the facts themselves, as between this case and the *Headley* case, except that in both cases the defendants were admittedly guilty of negligence *per se.* In that case by the violation of a city ordinance, and in this, by the violation of the statute of the state.

In this case, as in that, the court is required to deal with the facts, as bearing upon the question of contributory negligence alone. There the deceased attempted to cross four parallel tracks, and it was said, that "it is the imperative duty of one attempting to cross several tracks, not to cease his watchfulness, upon crossing the first, or second, in safety, but to continue to exercise his senses, and be observant of the obvious conditions until the crossing has been accomplished, unless the railroad company through its acts has produced a condition of apparent safety, where reasonable men might have different views as to the necessity of looking and listening."

Here, there was but one track and that not in a city, but in the open country, and not where switch engines as well as trains were constantly passing in both directions on all four of the tracks. There the court said:

"He neither looked nor listened, or, if so, acted other than recklessly after reaching the space between the south and north bound main lines. While it may be true that he was not, as a matter of law, in duty bound to stop upon

reaching such space, he was, nevertheless, required to look and listen, or act with reasonable prudence, before entering upon and attempting to cross the north bound main track."

Here, the plaintiff stopped, looked and listened, and there is not any indication of recklessness. It was clearly within the province of the jury to say whether or not, in such stopping, looking and listening, in the light of the surrounding facts and attendant circumstances, he exercised ordinary prudence and care.

In that case the court said: "The ground is level, and the tracks straight, with an unobstructed view in each direction for at least three-fourths of a mile." In this case the ground was not level. The road along which plaintiff was driving was in a depression, with the ground elevated to the direction from which the train was coming, and there were palpable obstructions to view; caused by trees, buildings and piles of lumber. The track was not straight, but approached in the form of a curve toward the crossing.

But in that case it appears that the deceased not only failed to stop, look or listen, but rode ahead on his bicycle from a point about two hundred and fifty feet from the crossing, without stopping, directly and heedlessly, upon the crossing, under circumstances described by the court as follows:

"He was next seen about 15 feet west of the coal yard track, and hence about 35 feet from the southbound main line, and approximately 45 feet from the point of collision. He was then riding at a speed of about 4 or 5 miles per hour. At that moment an 8 or 10 car passenger train with two engines, known as Train No. 1, traveling south at the rate of 25 or 30 miles an hour, on the southbound main line track, came upon the crossing and immediately after it had passed over, the 'Uncle Sam' train came upon the crossing. The trains were making considerable noise, and some smoke and steam which had escaped from Train No. 1, was blowing to the southwest in the direction of, and over, the Post coal yard, but in no sense interfered with

seeing by the different witnesses—except one who was standing on the west side of the southbound main line, just east of the Post coal yard board fence—the things which took place on the crossing. As 'Uncle Sam' train approached, a witness was walking on the track in the same direction the train was moving, and when about 200 feet south of the crossing, stepped off to the east for that train to pass. At this time the bell of the engine pulling the 'Uncle Sam' train was ringing, and Train No. 1 was passing on the southbound track. This witness, as the engine of 'Uncle Sam' train passed, looked ahead and across the pilot thereof and saw the wheel of a bicycle on the crossing, coming on the space between the southbound main line and northbound main line, which at that point are 8 1-3 feet apart. Another witness—the one standing on the west side of the southbound main line just east of the Post coal yard board fence, approximately 230 feet south of the crossing, and whose vision was somewhat obscured by the smoke, etc.—looked north to the crossing when the rear end of Train No. 1 rendered it possible; and saw the deceased on his bicycle turning to keep from hitting the 'Uncle Sam' train, and saw him fall. Another witness who was standing in the Post coal office, looking through a glass door in the direction of the crossing, a distance of approximately 45 feet, saw the collision. This witness testified that the whistle of the 'Uncle Sam' engine was blowing, and that " 'Uncle Sam' hit the crossing just an instant later than the No. 1 cleared the crossing;" that the latter had cleared the crossing between 20 and 40 feet; that when witness first saw the deceased he was sitting upright on his bicycle, riding toward the east with his hands on the handle bars, and it appeared to witness that the front wheel of the bicycle struck the side of the pilot; the pilot beam, at the rear of the pilot, hit him. Another witness testified that he was at the scales in the coal yard (which was about 50 feet from the point where the collision occurred, and in plain view thereof), that he heard 'Uncle Sam' coming in, and saw deceased falling alongside

the engine, and subsequently saw the track of the bicycle where it had turned; that No. 1 was then, after witness had run to the body of deceased, from 125 to 150 feet south of the crossing. It is alleged in the complaint and admitted in the answer that 'immediately' after the Train No. 1 passed over the crossing the 'Uncle Sam' train entered thereon and passed over the same."

Thus, with both trains on different tracks, approaching the crossing in opposite directions, and within his plain view, he recklessly proceeded in an effort to pass behind one train, in an apparent effort to cross before the second train should reach the point where he attempted to cross. Certainly under this state of facts there was an undisputed want of due care.

That case was by a divided court. I participated in the opinion but I could not conceive that it could ever be construed to apply to the facts appearing in the case at bar, and if it is finally so construed, I am ready to vote to overrule it at the first opportunity.

The majority opinion overlooks, if it does not in fact overrule, the doctrine declared in the case of *Nichols v. C., B. & Q. R. R. Co.*, 44 Colo. 501, 98 Pac. 808. In speaking of the rule of law as to when the question of negligence or contributory negligence may be determined as a matter of law, it was said:

"Cases frequently arise wherein it becomes the duty of the trial court to determine the question of the negligence of the plaintiff, as a matter of law, but those are cases where the testimony will allow no other inference; and hence, it follows that where the question of negligence depends on a state of facts from which different minds may honestly draw different conclusions on that issue, the question must be submitted to the jury for determination. *Colo. Central R. R. Co. v. Martin*, 7 Colo. 592, 4 Pac. 1118; *Lord v. Pueblo S. & R. Co.*, 12 Colo. 390, 21 Pac. 148; *Solly v. Clayton* Id. 30, 20 Pac. 359; *D. & R. G. Ry. Co. v. Spencer*, 27 Colo. 313, 61 Pac. 606, 51 L. R. A. 121."

And again it was there held:

"The obligations, rights and duties of railroads and travelers upon intersecting highways are mutual and reciprocal, and no greater degree of care is required of one then the other.  True, the railroad company has the right to precedence at such crossings; but both parties, in the exercise of their respective rights, are nevertheless required to exercise reasonable care in enjoying them—the one to avoid inflicting injuries, and the other to avoid being injured. A person attempting to cross a railroad track at a public crossing in a city has the right to expect that the railroad will give the signals required by law to warn him of the approach of a train, and that it will not be run at an excessive and dangerous rate of speed, and if he is without fault and such neglect and act on the part of the road results in his injury, then he can recover.  *Texas & Pac. Ry. Co. v. Cody*, 166 U. S. 606, 41 L. Ed. 132, 67 Sup. Ct. 703; *C. & E. I. R. R. Co. v. Boggs*, 101 Ind. 522, 51 Am. Rep. 766; *Cleveland, C., C. & St. L. Ry. Co. v. Miles*, 162 Ind. 646, 70 N. E. 985.

Speaking of the degree of care required by travelers, it was held:

"So that, in determining the degree of care which a pedestrian about to cross a track at a public crossing in a city must exercise, the general rule is, that the pedestrian who does not know of the negligence of a railroad company in running its train at an unlawful rate of speed, and in failing to give the required signals of its approach, and such want of knowledge is not the result of his failure to exercise a degree of care, he is only required to exercise that degree of care which ordinarily prudent persons will exercise when the railway company is also exercising the care which the law imposes upon it, in the operation of its trains at street intersections."

In that case the traveler looked but once, and it was contended as in this case, that this was insufficient.  It was said in answer to this argument:

"It is true that had plaintiff looked the second time, just

prior to stepping upon the track, he would have discovered the approach of the engine; but the law only required that he should stop, look and listen at the time and place necessary in the exercise of that degree of care which an ordinarily prudent person would have exercised in similar circumstance; and whether by looking only once, at the time and place he did, under the circumstances narrated, was a proper exercise of that degree of care which the law imposes, depended upon other matters which should be taken into consideration. Where in case of an injury at a crossing, it appears that the person injured did look for an approaching train, it does not necessarily follow, as a rule of law, that he has no remedy because he did not look at the precise time and place when and where looking would have been of the most advantage, and probably avoided the injury. Many circumstances might be shown which could properly be considered by the jury in determining whether he exercised the degree of care which the law imposes upon him. *Rodrain v. R. R. Co.,* 125 N. Y. 526, 26 N. E. 741."

It will be seen from that opinion, that in considering the question of contributory negligence, the plaintiff had a right to expect that the engineer would give the signals required by law to warn him of the approach of the train, and that the company will not run its train at any excessive or dangerous rate of speed   The majority opinion not only ignores this lawful right but positively denies it.

The rule stated in the *Nichols* case, in determining the degree of care to be exercised by the plaintiff, is as clearly ignored. But worse than this, the majority opinion repudiates the following declaration in the Nichols case:

"Where in case of an injury at a crossing, it appears that the person injured did look for an approaching train, it does not necessarily follow, as a rule of law, that he has no remedy because he did not look at the precise time and place when and where looking would have been of the most advantage, and probably avoided the injury. Many circumstances might be shown which could properly be con-

sidered by the jury in determining whether he exercised the degree of care which the law imposes upon him."

The majority opinion does in effect determine as a matter of law, that plaintiff, either because he looked but once, or because he did not look at the time and place when and where looking would have been of the most advantage, was guilty of contributory negligence, and utterly ignores the right to have considered all the circumstances in connection therewith, in determining the question of due care.

The majority opinion quotes extensively from the testimony of the plaintiff, who palpably neither speaks nor understands the English language with any degree of accuracy, and if he had an interpreter, such interpreter is but little if any improvement over the plaintiff in this respect.

Such testimony and the force of it is plainly much better understood and interpreted by the jury and the court in whose presence it is given, than by one who has nothing before him but the record wherein it is attempted to be reproduced. But the majority opinion overlooks the testimony of an apparently clear headed English speaking witness, as to surrounding conditions and circumstances bearing on the accident, and whose testimony is certainly entitled to consideration in the absence of nothing to the contrary.

The witness, named Garner, whose father's house is located west of the crossing, testified that he had been for three years a railroad brakeman; that at the time he was about 830 feet west of the crossing and about 35 feet from the track. That his attention was attracted by the speed of the train; that the engine and cars were swaying; that the train was a freight train of about fourteen or fifteen cars; that in his opinion it was going at the rate of fifty miles an hour when it passed him; that there was a whistling post about a thousand feet west of the crossing, and about two hundred feet west of the point where he was standing at the time; that there was no whistle blown nor bell sounded, until about the instant the engine struck

plaintiff at the crossing, when there were some short blasts of the whistle; that the train ran about 475 yards after striking plaintiff before stopping; one horse was killed; pieces of the wagon were scattered along the track for 1400 feet. Speaking of the obstruction to view from the road where plaintiff was driving, and for a distance of four hundred feet from the crossing west, he says: There is a cluster of trees and one cannot see; that his father's stable, and three or four clusters of willows are on the ground as it raises to the cut, and along the top of the cut its southern side, were corrals and stacked lumber; that approaching the crossing as plaintiff did, a glimpse of the track may be obtained through the trees at a point about 77 feet back from the crossing, this through an opening about a foot and a half wide. That 25 feet from the crossing, one cannot see up the track from where the train was approaching.

It will be observed that this testimony is not in accord with some of the deductions by the majority. In the majority opinion is inserted a photograph of the crossing where plaintiff was injured, but a photograph may be very uncertain, and even deceiving as regards angles, directions and distances when considered alone. The court speaks of a map but does not include it as a part of the opinion, and which is here inserted for a possibly better understanding.

It will be noted that in looking up the highway from the crossing, in the direction from which plaintiff was moving, and up the railroad track in the direction from which the train was approaching, the space between, forms an acute angle of about 45 degrees. So that to the extent of this angle, the train and the plaintiff were moving toward a converging point, to-wit: the crossing, the apex of a triangle. This is far different from crossing at right angles, where one may see directly to the right or left. This triangle contained the trees and other obstructions.

It will be seen that the plaintiff, if facing the direction in which he was driving, and upon reaching the first point of view between the trees and the track, could see but little

EXHIBIT 3

Map Showing Road Crossing in the W½ SW¼ Sec 33 T 12S R 63 W
Near El Moro Las Animas County Colorado

SCALE 1 inch = 50 feet

JUNE 18TH, 1914

Mr. Garcer's House.

532 ft. from road crossing

Right of Way Fence

Cut about 8 ft. deep along here.

Trees 40 to 50 ft. high

432 ft. from road crossing

ROAD

120 ft. from crossing

25 ft. from crossing

Denver & Rio Grande R.R. To El Moro

Colorado & Southern Ry. To Texas

PULASKI DITCH

Right of Way Fence

of the track to the left of him. Before he can view the
track for any considerable distance, he must turn his head
or body to the left sufficiently, or to the extent of three-
fourths of an "about face," before his vision could follow
the line of the track, and according to the finding of the
court, this could not occur until the heads of his horses
were at least over the first rail. With this in mind the
question of whether or not he was reasonably cautious in
proceeding the short distance of 77 feet, after stopping,
looking and listening, was a question for the jury in the
light of all the surrounding circumstances.

The opinion recites that "A map prepared by defendant
and introduced by plaintiff, shows that from any point on
the wagon road, 25 feet south from the crossing where the
accident occurred, there is an open and unobstructed view
along the track and right of way of defendant's road, west
for a distance of 432 feet from the crossing, etc.

This may be deducible from the map, but it is in dia-
metric conflict with the testimony of the witness Garner,
as to the physical fact, and likewise to the construction
placed on the testimony in the case, by the trial court.

The witness Garner testified as follows upon this point:

"Q. How close do you get to the track before you get
a clear view? A. In seven feet from the track you get
a clear view, eleven feet you get an open view, but not ex-
actly clear. From eleven feet you can see down the track
probably one hundred and twenty to one hundred and fifty
feet. The roots of the first group of willows (marked 'a'
on the map) is seventeen feet from the C. & S. southern rail.
The branches extended out on both sides over the wire
fence that touches the cattle guard."

And on cross-examination testified as follows

"Q. Now, when a man is standing 25 feet back from the
track in the middle of the road, what is to keep him from
seeing at least 150 feet up the track? A. Well, back 25
feet I do not think he could see up the track on account of
this cluster of willows in here. Their roots are 17 feet
from the rail, the roots are, some of them there, probably

six inches, some probably eight inches through. The clump of willows are about 120 feet from the center of the public crossing. I do not know how wide the foliage on them is, I did not measure how far the foliage extended from the trunks. The willows are about 10 or 15 feet high. I did not measure their height. They are old willows, been there for years."

The trial court gives his conclusion deduced from testimony upon this point as follows:

"If the plaintiff had looked, 30 yards back from the track, which must be admitted, there would be no question but that he could not have seen the train according to its speed. (45 miles per hour.) It was not in sight. It was away down the track so that it would have been impossible for him to have seen it. It is practically undisputed that there were no other places where he could have seen the train, on account of the obstructions, trees, and so forth, until he had gotten up within 10 or 15 feet of the track. (This is from his seat in the wagon.) The horses' heads would be at or on the track."

If then there is such a divergent view as to the facts as between the showing by the map, and the oral testimony, the question should have been submitted to the jury for determination.

The plaintiff testified that at a point about thirty yards from the track crossing the highway, he stopped his team, stood up in the wagon and looked and listened to see if a train was approaching. That he could not see or hear it. His testimony on cross-examination would seem to indicate that there was no place where he could see through the trees at the point where he stopped to look. It is probable that in this testimony he referred to the distance after stopping, and between that point and the approach to the crossing. He afterward corrected this testimony to show that at the place where he stopped to look, he could see through the trees a distance of about 180 feet. The witness Garner testifies that by actual measurement there is

an opening through the trees about a foot and a half or two feet wide, where one could see the track, seventy-seven feet from the crossing. That he examined this place for the purpose, a few days after the accident while the trees were in full foliage, and ascertained the fact to which he testified.

The difference between the estimate of plaintiff, of thirty yards, and the measurement by Garner, is so slight as to be immaterial. It is the difference between the estimate of 90 feet and the actual measurement of 77 feet. Then, the testimony shows that he did stop, look and listen, where he could see the track through the trees at a point 77 feet from the crossing. Under the doctrine in the *Nichols* case, it was plainly for the jury to determine whether under all the circumstances his acts were sufficient to show want of reasonable care upon his part.

Under the authority of the *Nichols* case and the authorities generally, the plaintiff had the legal right to have certain facts and circumstances as bearing upon the question of his alleged contributory negligence.

He had the legal right to have considered the fact that defendant had erected a whistling post at a point about 1,000 feet from the crossing and upon the curve in the track, as indicating an admitted duty and custom, as well as an admission that the crossing was dangerous. He had the legal right to have considered as bearing upon the question of the charge of contributory negligence, the fact that defendant did not cause the whistle to blow, or the bell to ring, at this point or at any other time, before the instant he was struck by the engine. He had the legal right to have so considered, the fact that the train was running down grade, and the consequent and comparative slight noise the train was making in its approach to the crossing.

He had the legal right to have so considered the excessive and reckless speed at which the train was running at the time. He had the legal right to have so considered the custom of the railroad in these respects, and his own familiarity with that custom, by reason of the fact of his

daily travel over the highway as a market gardener for several years. He had the legal right to have so considered the statute of the state prohibiting a railroad train from crossing the track of a cross railroad without stopping, and which if complied with by the defendant in this case, the accident would have been clearly avoided.

These are all facts and circumstances competent as bearing upon the question of contributory negligence. These legal rights were all denied by the trial court, and now by this court.

Section 5499, Rev. Stat. 1908, provides:

"In all cases where two railroads shall cross each other, every train on approaching such crossing shall come to a full stop immediately before it reaches such crossing, and shall cross such track at a speed not exceeding four miles per hour."

By the succeeding section, failure to comply with the provisions of said section is made a misdemeanor on the part of the engineer or other person in charge of the locomotive or train. The D. & R. G. Co. track crosses the defendant's track about 30 feet west of the highway. The defendant's train did not stop but continued over it at the speed of about fifty miles an hour.

The majority opinion states that defendant's brief on rehearing, asserts that the D. & R. G. Co. was not operating its track, and that it was only a switch. There is no such fact appearing in the record, and it is hardly just to plaintiff to bind him by a statement in his opponent's brief, which finds no justification in the record.

It appears in proof, that at the particular point, the two railroads cross. The statute is a general statute and as such it was the duty of the trial court to take judicial notice of it. Beside, the statute does not confine the duty of railroads, in this respect, to main tracks, nor to tracks not at the time operated. The existence of the law and the plaintiff's palpable violation of it, not only established negligence on the part of the defendant, but was a circum-

stance which the plaintiff was entitled to have considered as bearing upon the charge of contributory negligence.

In this connection I am impressed with the view that the majority opinion does not sufficiently weigh the rule that the law requires that the defendant must prove the contributory negligence it alleges, but in effect has placed the burden on the plaintiff to prove that he was not negligent.

In support of the position I have taken, I may further say that the establishment of the whistling post indicates such duty upon the part of the engineer. If in addition to this fact the plaintiff could have proved a habit in this respect, which the court declined to permit him to do, and if he could have shown that he was familiar with such habit and relied thereon, it would have been a strong circumstance for the consideration of the jury in determining the question at issue.

In a case presenting a very similar state of facts as the case at bar, it was said in *Nash v. N. Y. C. & H. H. Ry.*, 1 New York Supplement, 269, affirmed by New York Court of Appeals, 117 N. Y. 628, 32 N. E. 1128:

"It was certainly competent to show that the defendant had erected whistling posts, and was in the habit of whistling near this crossing, upon the question whether the plaintiff, under all the circumstances, exercised due care. It was extremely difficult for a person approaching this crossing to see a coming train. Besides, the track was so constructed as to muffle the sound of a running train. The plaintiff testified that he stopped about 75 feet away from the track, and listened to ascertain if any train was coming. If it had been the universal custom to give warning at this place, and that was known to the plaintiff, it was material for the jury to know this fact in order to judge properly of the conduct of the plaintiff. It was also a question for the jury as to defendant's negligence. While it is true there is no law making it obligatory upon a railroad company, to give warning except at public crossings, yet they may make a law for themselves. If such company establish a uniform practice to give a signal at a crossing, although private, but frequently used, and such practice

is notorious, such conduct justifies the expectation of those having occasion to cross that such warning will be given; and a failure to give the accustomed warning is a proper fact for the jury to consider in passing upon the question of the defendant's negligence. *Ernest v. Railroad Co.*, 39 N. Y. 61, 100 Am. Sec. 405; *Cordell v. Railroad Co.*, 64 N. Y. 535."

In this day courts are prone to unconsciously perhaps assume too much of the prerogatives properly belonging to the jury, and to restrict that constitutional body in the exercise of its rightful powers. In this there is grave danger that this Gibraltar of English and American liberty may be eventually undermined.

It seems to me that in this case the strongest argument in favor of submitting the cause to the jury, is the widely divergent views among the members of this court, not only as to the conclusions which may properly be drawn from the testimony, but as to the testimony itself. If the judges of this court so differ in the proportion of four to three, can it be said that there is but one inference to be drawn, or that different minds may not honestly draw different conclusions. If the minds of the members of this court may so honestly differ, why may not the minds of jurors just as honestly differ. The logical deduction from the opinion of the court is that minority judges, and jurors generally, either do not have rational minds, or that they may not honestly reach a conclusion differing from the majority. The important matter is the answer to the question, has the long established rule we are considering, ceased to be a governing principle of the law, or is the submission of cases of this character to the jury, to be determined by the personal view of a majority of the judges, as to whether or not negligence has been proven in the particular case. Indeed, the trial judge in this case clearly ignores the rule, and based his action on his personal conclusion, for he said in his findings, "I am clearly of the opinion that the plaintiff is guilty of such contributory negligence that under the law he is not entitled to recover."

Decided March 5, A. D. 1917. Affirmed on rehearing December 3, A. D. 1917.