## No. 18,940.

THE DENVER & RIO GRANDE WESTERN RAILROAD COMPANY
AND HERBERT E. MCALROY *v.* EDWARD J. DUFF.

(358 P. [2d] 456)

Decided December 23, 1960.   Rehearing denied January 23, 1961.

Mr. T. A. WHITE, Mr. T. A. CHISHOLM, Mr. KENNETH D. BARROWS, for plaintiffs in error.

Mr. KENNETH N. KRIPKE, for defendant in error.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

THE parties appear here in reverse order of their appearance in the trial court. We refer to the plaintiffs in error as defendants or the Railroad, and to the defendant in error as Duff.

Duff brought this action to recover damages for injuries to his person and property arising out of a collision between his car and a passenger train owned and operated by the Railroad.

The collision occurred at about 4:30 P.M., June 7, 1957, at a point where West Hampden Avenue crosses the tracks of the Railroad at the outskirts of Englewood, Colorado.

Trial to the court without a jury resulted in a judgment in favor of Duff and against the Railroad and defendant McAlroy, who was the locomotive engineer operating the train involved in the collision.

The defendants are here by writ of error seeking reversal of the judgment.

Among the grounds urged for reversal are the following:

1. Error in not finding that the proximate cause of the collision was the act of Duff in backing his car into the path of the approaching train;

2. Error in holding that the Railroad was guilty of negligence in operating its train at a speed of sixty miles per hour at the time and place in question;

3. Error in holding that the speed of the train was the proximate or a contributing cause of the collision.

At the place of the collision Hampden Avenue runs east and west, the tracks of the Railroad north and south. Three tracks are crossed by Hampden Avenue; the northbound main line is the easterly track; west of this track

is a spur, or industry track; nine feet west of this industry track is the southbound main line track on which the train involved was traveling. On the day in question the weather was clear and dry, visibility excellent, and the westbound motor traffic on Hampden Avenue at the point of crossing fairly heavy.

Safety devices of the Railroad at this crossing consist of flashing red lights, bells and automatic gates tipped with red lights. Dartmouth Avenue is 2711 feet north of this Hampden crossing. A southbound train traveling south on the most westerly track at a speed of *sixty miles an hour, or over,* activates these devices at a point 1287 feet north of Dartmouth Avenue. Immediately on being activated the bells at the Hampden intersection start to ring and the lights to flash; eight seconds thereafter the gates start to lower and the bells, lights and gates continue to operate until the train has passed the intersection. If the train is traveling at a *speed of less than sixty miles per hour,* the safety devices are so activated when, and not until, such train reaches Dartmouth. Thus it mathematically appears that the bells ring and lights flash at Hampden for more than thirty seconds before the train reaches the crossing and this is true whether the train is traveling more or less than sixty miles per hour.

A westbound motorist approaching the Hampden crossing, when a train is coming, is confronted with four flashing red lights on his traffic lane and, as further warning, the ringing of the crossing bells. His view of the tracks to the north and of an approaching train from that direction is clear and unobstructed from a vantage point east of the easterly track and at all points to the west thereof as far as Dartmouth Avenue.

The train involved in this collision consisted of three Diesel units and nine passenger cars. It was traveling south on the most westerly of the tracks and as it crossed Dartmouth it was traveling just under sixty miles per

hour, so the safety devices were activated as the train crossed Dartmouth.

Duff was driving his car, a 1956 Chevrolet, west on Hampden. The evidence shows that he was thoroughly familiar with the crossing. He approached the crossing from the east at a very moderate speed, estimated at about five miles per hour, traveling in the south portion of the north traffic lane, and he, according to findings of the trial judge well supported by the evidence, was at least twelve feet east of the most westerly track when the lights and bells were activated by the train 2711 feet to the north and over thirty seconds in time from the crossing. In spite of these warnings and in spite of the fact that at that time and place the approaching train was plainly visible to one in his position, he proceeded on and crossed the most westerly track following (according to Duff) some five or six feet behind a pickup truck being driven by one Rex. He crossed the most westerly track and was from two to six feet to the west thereof when his further progress was blocked by the Rex pickup truck standing in the traffic lane ahead of him. Rex had stopped as he reached Santa Fe Drive, because of a red light and northbound traffic thereon. Duff pulled up behind him and stopped. He honked his horn and waved to Rex to move forward. Rex did not move and he testified that he could not move forward without getting into Santa Fe Drive and traffic thereon and that there was a space of three or four feet between his truck and Duff's car. Duff testified that the space was about one foot.

The evidence is undisputed that the front end of the Rex truck was thirty-seven and a half feet to the west of the west rail, his truck was fifteen and two-thirds feet in length, the length of Duff's car was sixteen and five-twelfths feet long. Had the two cars been touching, the rear end of Duff's car would have been five and five-twelfths feet from the west rail and three feet from the west side of the engine. Duff was very positive in his

testimony that he was within one foot of the truck of Rex; according to that he would be stopped two feet clear of the engine.

Duff, believing that the rear end of his car was not clear of the track and seeing the train approaching from the north, attempted to back easterly away from the Rex pickup, intending to pull into the right traffic lane which was clear of traffic and move west in that traffic lane away from danger. Testimony was to the effect that he backed east from two to six feet; Rex denies this and testified that he stalled his motor and his car never moved. The right rear tip of his car was struck by the right front overhang of defendant's locomotive. Duff's car was damaged, and although he had finally jumped out of his car at the last moment he failed to clear his own car and was knocked down and injured when his car was pushed southward by the impact of the engine.

The trial judge did not formally find the facts, state his conclusions of law or file an opinion or memorandum of decision as contemplated and provided by Rule 52(a), R.C.P. Colo. However, in the record we find some sixty folios of observations, statements and conclusions of the trial judge, including many statements of facts *dehors* the record, facts of which the judge took judicial knowledge, and other facts apparently garnered from viewing the scene of the collision.

The trial court did conclude that Duff was at least twelve feet east of the west track at the time the warning signals, red lights and bells were activated, and concluded that in proceeding against the red lights and the warning bell Duff acted as a reasonably prudent man, and was not negligent.

He also expressly found that Duff, after crossing the track, did back up:

"I believe that he did move his car backward. * * * Two witnesses, one being an independent witness, Dr. Castelano, testified they saw the car go back two or three

feet; four feet, one foot * * * in any event it went backwards."

On the question of fact as to whether Duff's car was clear of the approaching train prior to its being backed up, the court not only made no finding, but stated that the answer is unknown to the court:

"Whether in fact or not Mr. Duff actually cleared the trackage is unknown to the court."

There was ample evidence on the question to have made a finding. Duff testified that his car never moved backward and yet it was hit, so, according to the testimony of Duff, it was not clear of the train. On the other hand, Dr. Castelano testified that he thought the car was clear of the track. Pat Herndon, a passenger in Duff's car, thought it was in the clear. Defendant McAlroy, who had a perfect view from his engine cab, of the track and Duff's car, testified that Duff's car was six feet clear of the train until the train was about two hundred feet from the crossing when Duff backed his car into the path of the train.

The court also concluded that the Railroad, in approaching the Hampden crossing at a speed of sixty miles per hour (which speed is admitted), was guilty of negligence as a matter of law and that such negligent conduct was the proximate cause of the collision.

We are unable to agree with the conclusion of the trial court that for Duff to cross the track against the red lights and with the warning bells ringing was the act of a prudent man and did not constitute negligence. Even Duff, it appears, was aware of the fact that he should not drive through red lights, and in order to escape the consequences of so doing, he, contrary to all of the other testimony, the physical facts and the findings of the trial court, testified that the warnings did not come until he had crossed the track. The trial court found this fact against Duff and erroneously concluded that conduct, negligent as a matter of law, was not negligence at all. It is true that Duff crossed the track, or partially crossed

the track, without incident at that time, but it was the act of crossing that got him into a position of peril, which whether real or fanciful the court was unable to decide.

██ The proximate cause of the collision was the fact that Duff moved his car backwards. The court found that Duff backed up and in so doing reached a position where the overhang of the engine struck his car. Such backing up was the proximate cause of the collision. The fact that the trial judge was unable to determine whether Duff was clear of the train does not alter the situation. If he was in the clear, certainly his backing up was the cause of the collision; and if he was in the path of the train before backing up, his backing up and stalling his car only added to his primary negligence in having his car on the track.

If running the engine at a speed of sixty miles per hour was negligence on the part of the Railroad, as the trial court concluded, and on which question we need express no opinion, such negligent speed was not and could not be the proximate cause of the collision. Even if the engine had been going only ten miles per hour, it would collide with an object on the track just as certainly as one going one hundred miles per hour.

Had the train been going slowly, it is possible that McAlroy might have been able to bring the train to a stop and thus save Duff from the normal consequences of his negligence. However, the parties do not argue or contend that the doctrine of last clear chance is applicable in this case and such issue was never considered by the court.

██ Duff testified that he did not see the approaching train until he had crossed the track and stopped behind Rex. The approaching train was plainly visible from the Hampden Street crossing. There was nothing obstructing Duff's view. The fact that he did not see the approaching train or the crossing lights does not relieve him from negligence. It was his duty to see that which was plainly visible. *Gunby v. C. & S. R. R. Co.*, 77 Colo.

225, 255 Pac. 566; *Nucci v. C. & S. Ry. Co.*, 63 Colo. 582, 169 Pac. 273; *Union Pac. v. Cogburn*, 136 Colo. 184, 315 P. (2d) 209.

Even accepting Duff's contention that the signals did not function until he stopped behind Rex, at which time he first saw the train and was then in the path of the approaching engine, he still had thirty seconds of time to remove his car from the track or, failing in that, to remove himself from the car to a position of safety. He did neither.

In *Straight v. Power Co.*, 73 Colo. 188, 214 Pac. 397, we said:

"One whose injury is due, in whole or in part, to the fact that he has negligently and without excuse placed himself in a position of known danger can not recover. *Jackson v. Crilly*, 16 Colo. 103, 107, 26 Pac. 331.

"The rule is equally applicable to one who having taken such position without knowledge of the danger, or even upon assurance of its nonexistence, thereafter becomes fully cognizant of the danger of the position and negligently and without excuse remains. The reason for the rule applies with double force where the danger is apparent but its source and method of approach are hidden."

Duff in crossing the tracks against the warning signals was guilty of negligence as a matter of law. In knowingly backing his car into the path of the approaching train he was guilty of further negligence as a matter of law. This conduct on his part was the proximate cause of the collision and of his injury and property damage. Such conduct precludes him from recovery herein.

The judgment is reversed and the cause remanded with directions to dismiss the action.

Mr. Justice Frantz concurs in the result.

Mr. Chief Justice Sutton, Mr. Justice Moore and Mr. Justice Doyle dissent.

Mr. Justice Frantz concurring in the result:

There is antagonism of view between the opinions of Mr. Justice Hall and Mr. Justice Doyle, and both, I maintain, hold positions opposed to established principles of law. Since I would not have this court place in jeopardy or forsake time-tested rules, I would state briefly why I concur in the result only of the opinion of Mr. Justice Hall.

I am persuaded that the casualty forming the basis of this suit was the result of an unfortunate accident in which neither party was at fault. Criteria for responsibility are subjective in this case; we must consider the circumstances as they affected the minds of Duff and the trainman in order to apply the proper rules. When so done, we then ought to say, "Damnum absque injuria."

Duff, according to the trial court's findings, believed himself in danger. His apparent danger motivated his conduct; he must extricate himself from his perilous plight. Time, place and circumstances were elements with which his conduct as an ordinarily prudent man must be measured and weighed. Who would assert that as a matter of law Duff's action in the locale considered was not such as would be expected of the ordinarily prudent man?

Realizing that the "ordinarily prudent man" test has been greatly criticized, and admittedly with some justification, I, for one, would retain it until a better is devised. I doubt if there is one of us who would wittingly put the ordinarily prudent man out of countenance, and yet, I fear that Mr. Justice Hall and those who agree with him have slighted the ordinarily prudent man by ignoring his presence in this case.

Did the trainman violate a duty? As I view it, only the speculation of the trial judge makes possible the creation of a duty as to the trainman. The trial judge could not determine whether Duff's motor vehicle was

on the tracks or within reach of the overhang of the train. He did find, though, that Duff had crossed the tracks and then backed up an indeterminate distance.

The testimony overwhelmingly put Duff's motor vehicle out of danger. The trainman so testified, and so did the disinterested witnesses. Only Duff believed he was in a position of danger.

To the trainman Duff had crossed the track and was safely located away from the overhang of the locomotive. Only by clairvoyance, if he had any, could he know Duff's mental state — his apprenhension of being in a zone of danger. If through some occult faculty the trainman discovered Duff's apprehension, he would be under a duty to forfend the consequences of the natural reaction of Duff to extricate himself from a place of peril.

But in the absence of knowledge that Duff entertained such apprehension, the trainman was not required to anticipate that Duff would back his motor vehicle too near or upon the track. On the contrary, the trainman "could not be said to be negligent in *assuming* that [Duff] would remain in a place of safety, to the side of the track where he first stood." (Emphasis supplied.) *St. Louis, I.M. & S.R. Co. v. Gibson,* 48 Okla. 553, 150 Pac. 465. See *Mouso v. Bellingham & N. Ry. Co.,* 106 Wash. 299, 179 Pac. 848; *Higgins v. Wilmington City R. Co.,* 15 Del. 352, 41 Atl. 86; 74 C.J.S. 1400, §751.

Trainmen "may reasonably assume that the vehicle will halt before getting into a position of danger. They are not required to assume otherwise until, in the exercise of reasonable care, they should apprehend danger." *Engberg v. Great Northern Ry. Co.,* 207 Minn. 194, 290 N.W. 579, 154 A.L.R. 206.

The duty of care on the part of the railroad company is to be determined "by considering what the engineer of a locomotive would be justified in counting upon from travelers on the highway approaching the crossing." *Western Maryland Ry. Co. v. Myers,* 163 Md. 534, 163 Atl. 700. There is no reason to hold that the rule should

be otherwise where the traveler had negotiated the crossing, and nothing was present to indicate to the trainman that the traveler felt compelled to back his vehicle toward the track he had just crossed.

Because of the conditions confronting them as each viewed his own situation, it cannot be said that either Duff or the trainman acted negligently. So believing, I concur in reversing the judgment.

Mr. Justice Doyle dissenting:

Although I recognize that the question dealt with by the majority of the Court, whether the plaintiff here was guilty of contributory negligence, is difficult and complex, I nevertheless am unable to accept the majority's conclusion that the undisputed facts lead to but one possible inference, that of contributory negligence as a matter of law. In my opinion, the plaintiff in this case was acting under the influence of an emergency. He faced a dilemma, both facets of which posed danger. He was threatened with injury regardless of whether he stopped or went forward. His judgment formed under the press of such circumstances does not demand a legal conclusion of contributory negligence.

Some preliminary discussion of the facts, most of which appear in the findings and comments of the trial court, will provide background for analysis of these most interesting legal questions. The court found that Duff was some 10 or 12 feet behind the pickup truck which was being driven by one Rex at the time that the train signals were activated. The court placed him in the middle of the industrial tracks just east of the track in question at the time the railroad signals commenced to flash and to ring. The court pointed out that for Duff to stop there would have placed him astride the tracks — that he could not stop between the tracks because there was not room — and that it was not reasonable for him to stop and back up at this point. The judge said:

" * * * The only thing he could do was go forward,

and recognizing this, Mr. Rex attempted to pull as far forward as possible. * * * "

The court further found that the traffic signal on Santa Fe was then showing *green.* To be sure, there was also a red light showing, but this green light was very much in evidence and presumably was for the purpose of clearing this intersection so as to prevent a jam up such as that which occurred. Noteworthy also is the fact that when the signals were activated the train was one-half mile or 30 seconds from the crossing. Duff had to cross the track, discover his peril and take the other actions described by him in these 30 seconds. Thus very little time remained for premeditation or deliberation.

As to evidence regarding subsequent events (after Duff had crossed over the westerly tracks), the finding was that Duff believed that his vehicle was in danger of being hit by the train. Whether it was actually in danger, the court was unable to find, but as the judge pointed out, this was inconsequential. The real question was whether Duff had a reasonable basis for believing that he had not cleared the westerly rail of the track on which the train was running, so that he felt compelled to act fast so as to avoid the impact.

The case must be determined from two distinct standpoints, first, as to whether there was immediate or proximate negligence growing out of the happenings just prior to the impact on the part of the plaintiff and the railroad; and secondly, whether the parties were guilty of antecedent negligence or in the case of the plaintiff of antecedent contributory negligence.

### I.

It is amply clear that the Rio Grande was not negligent in failing to stop or to take any other steps after discovery of Duff's peril. This was found by the trial court and I agree with this finding. The train was then traveling at a speed in excess of 60 miles per hour and a stop would have required more distance than was available to it. Duff was not shown to have been on the

track until the train was at most a few hundred feet away. We can thus eliminate the possibility of avoidance by stopping and in so doing the last clear chance issue is also eliminated. I reach the same conclusion with respect to *Duff's* negligence at the time just preceding the impact. According to the undisputed evidence, Duff was approaching the tracks in question at a very slow rate of speed when the signals became activated. After this, there were only 30 seconds. During those 30 seconds, Duff pulled up behind the Rex vehicle and stopped, he became apprehensive, he sounded his horn, he signalled to the driver of the Rex car and then decided to move his vehicle. The trial court found that he actually backed the vehicle a few feet. By that time the train was in very close proximity and notwithstanding that Duff had difficulty with the car door on the left side, he was able to get out of the car and to move a few feet away from it. The 30 seconds were action packed.

The trial court found that Duff was operating in an emergency and that this factor was entitled to be considered in deciding whether he acted prudently. The evidence supports this finding. I am impressed with the fact that there was a great shortage of time within which to act and as the court indicated, if defendant had had even a few more seconds he could have extricated himself. Looking backward, it is now possible to conclude that Duff should have made no effort to move his vehicle. But, we do not judge negligence in this manner and I do not think that a man in the position he was in is required to make this decision correctly or suffer the consequences. As was said by Mr. Chief Justice Holmes in *Kane v. Worcester Consolidated St. R. R.*, 182 Mass. 201, 65 N.E. 54, "A choice may be mistaken and yet prudent."

The extent of a train overhang is uncertain and how could he know that it would miss him? Therefore, it is enough that a prudent man would have become apprehensive and it furnishes no answer to prove that in fact

he had a foot or two clearance. The issue is whether, looking forward not backward, we must say that Duff acted reasonably and prudently for his own protection under the circumstances presented to him. In considering similar facts, this Court *per* Mr. Justice Campbell in *Colorado Midland Ry. Co. v. Robbins,* 30 Colo. 449, 71 Pac. 371, made these pertinent comments:

" * * * the court said to the jury that if one uses bad judgment in the excitement of the moment of danger, this of itself does not prove negligence, and in such cases plaintiff is only required to use ordinary care to prevent injury. Defendant's criticism of this instruction is that it applies only when the peril has been brought on by the negligence of a defendant, and is wholly inapplicable where a plaintiff voluntarily places himself in a position of danger for the protection of his property. As already intimated, there was sufficient evidence in this case to make the instruction applicable. Let us consider for a moment the situation in which plaintiff was placed. He was driving his team along a public highway where he had a right to be. He was supposed to know that the ordinance of the city restricted railroads in running their trains to six miles an hour. He had a right to presume that the train which he saw approaching was not exceeding that limit. He testifies that had the ordinance been observed he would have been able to take himself and team out of the dangerous place. It is too clear for argument that he was in a dangerous place on the highway when he saw the train approaching, and it was but an act of ordinary prudence, as we think, for him in the circumstances of the case to do as he did. He might well have concluded that to extricate himself from the threatened peril it was safer to jump from the wagon and turn his horses than to undertake to remain in the wagon with the train bearing down upon him. There was enough in the evidence to warrant the court in giving this charge, and though defendant did not know when he alighted from the wagon that the train was running at a

speed of eighteen or twenty miles an hour, this fact, if it was shown, may have been, and the jury were justified in finding that it was, the negligent act on the part of defendant that placed plaintiff in a perilous situation; hence it cannot be said that plaintiff voluntarily exposed himself to danger to save his property. On the contrary, the jury might well find that defendant's antecedent negligent act led plaintiff to act as he did. At all events, the question as to whether the course adopted by him to avoid the danger was such as a man of ordinary prudence would have chosen was peculiarly a question for the jury, and since they were given clear and explicit instructions as to the law of the case, their finding cannot be disturbed."

In the light of these considerations, I would conclude that defendant was not guilty of negligence as the result of his hasty conduct immediately preceding the impact. It, of course, remains to inquire whether he negligently created the condition of emergency, if so, the emergency exception which allows him to make a mistake would not be available.

## II.

*The question of whether Duff was guilty of antecedent negligence which barred his recovery or which prevented his invoking the emergency doctrine.*

The trial court devoted considerable attention to the question of whether Duff was guilty of negligence and concluded from the facts and from the applicable law that he was not. The basis for the court's determination was first, that the plaintiff was not guilty of negligence by reason of his efforts to extricate himself from his position of peril and, secondly, that he was not guilty of negligence in crossing the tracks.

The next question is whether Duff's election to cross the tracks was, under the circumstances, unreasonable. The obligation of one crossing railroad tracks to look carefully and to exercise care to protect himself is fundamental. Cf. *Baltimore & Ohio R. R. Co. v. Good-*

*man,* 275 U.S. 66, and *Pokora v. Wabash Railway Co.,* 292 U.S. 98. See *Denver & Rio Grande R. R. v. Ryan,* 17 Colo. 98, 28 Pac. 79. See also *Nichols v. C. B. & Q. R. R. Co.,* 44 Colo. 501, 98 Pac. 808. In the latter case the Court said:

" * * * A person attempting to cross a railroad track at a public crossing in a city has the right to expect that the railroad will give the signals required by law to warn him of the approach of a train, and that it will not be run at an excessive and dangerous rate of speed, * * * "

In the instant case Duff had crossed the easternmost tracks, the northbound ones, and was in the process of crossing the central set of tracks when the signals were activated. The question which arises is whether a prudent man would have stopped on these service tracks or would have proceeded to drive the 9 feet across the tracks on which the train was running. At this time the train was 2600 feet away. Duff then had at least one green traffic light. I fail to see how a motorist in this position can be adjudged guilty of contributory negligence as a matter of law because he elects to proceed. The train was some distance from the crossing. To hold that he was negligent in these circumstances you must overlook the green light factor and you must also conclude that a prudent man would foresee the subsequent events and avoid them. But Duff had no reason to suppose that he would not clear the tracks, a matter of a few feet. There was no reason to anticipate that the truck driven by Rex would be stopped ahead of him with the brake set and that he would be trapped in a position of peril. He was also faced with a hazard if he stopped in the middle of the service track. It seems to me that a prudent man would have taken the course which Duff took rather than the alternative of stopping or backing up. Consequently, I disagree with the position of the majority that this action constituted contributory negligence which is the sole proximate cause of the injury.

### III.

*The question whether the Rio Grande was guilty of antecedent negligence.*

The trial court pointed out that the intersection at West Hampden and Santa Fe Drive is a highly congested one. It is located just south of the Denver city limits and not too long ago was open country. Now it is substantially an urban community. The court noted that this is one of the fastest growing areas in the State of Colorado.

" * * * The population is beginning to spread and boom and traffic at all points along the line is being increased daily."

The court also observed that the Denver city ordinance limits the speed of the trains to 35 miles per hour within the city and that the train increases its speed, notwithstanding the congestion, the moment it crosses Yale Avenue from 35 miles per hour to 60 miles per hour, the speed it was traveling at the time of the impact. On this, the trial court said:

" * * * The Denver city ordinance, as the testimony reflects, requires 35 mile an hour speeds in Denver. Isn't that a test? Isn't that a standard? Isn't it fair to say that the area between Yale and Littleton is just as equally as populous with vehicles, pedestrians, persons traveling therein as the area between the station and Yale? I think it is not an unfair comparison. In my opinion the speed at this particular point constitutes, in this set of facts, a negligent act and the Court so finds. * * * "

The judge added:

" * * * I see nothing to be gained by traveling at such high rates of speed for a distance of two or three miles when some of the worst tragedies in Colorado railroad history have occurred between Yale and Littleton. What is two or three minutes gained as measured against public safety? (Quoting Herrara v. Southern Pacific, 318 Pacific 2d 784.)"

That the Rio Grande was guilty of negligence in oper-

ating its train at this high speed in an area admittedly congested seems to me fundamental. There can be no question but that such speed under the circumstances shown is hazardous. It is a threat to every motorist required to traverse this intersection, and the chance that someone would come into conflict with the train was substantial and the extent of harm likely to follow if this occurred was also great. Thus it can be said that a substantial risk of harm was posed as a result of the failure to take positive steps to prevent collisions by such precautions as earlier activation of signals, construction of control gates which would prevent traffic from crossing, or finally, by the failure to observe speed commensurate with the extent of congestion.

As indicated, the mere fact that a risk is created does not mean that the defendant is thereby guilty of negligence. An adjudication of negligence can be made only if the risk is in law unreasonable. The Restatement of the Law of Torts expresses it as follows (sec. 283, (c) Weighing Interests):

"The judgment which is necessary to decide whether the risk so realized is unreasonable, is that which is necessary to determine whether the magnitude of the risk outweighs the value which the law attaches to the conduct which involves it. This requires not only that the actor should give to the respective interest concerned the value which the law attaches to them, but also that he should give an impartial consideration to the harm likely to be done the interests of the other as compared with the advantages likely to accrue to his own interests, free from the natural tendency of the actor, as a party concerned, to prefer his own interests to those of others."

In the Restatement, sections 291 and 293, the factors which enter into evaluating the utility of the actor's conduct against the magnitude of the risk are set forth. In sec. 293 it is pointed out that the magnitude of the risk increases as the chance or likelihood of injury increases

and as the extent of the possible harm which will result from a collision if it occurs increases. For a full discussion of these axiomatic principles, see Terry, *Negligence,* 29 Harv. L. Rev. 40, 42 (1915). See also the comments of Prosser, *Torts,* 123 (2d ed. 1955). The author cites numerous examples illustrating the evaluation process here under consideration and sums up the principle as follows:

"It is fundamental that the standard of conduct which is the basis of the law of negligence is determined by balancing the risk, in the light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect, and the expedience of the course pursued. For this reason, it is seldom possible to reduce negligence to any definite rules; it is 'relative to the need of the occasion,' and conduct which would be proper under some circumstances becomes negligence under others."

An early Iowa case, *Beatty v. Central Iowa Railway Co.,* 58 Iowa 242, 12 N.W. 332 (1882), provides a graphical illustration. The question there considered was whether it was negligence for the railway to maintain its tracks along a public highway so that one traveling the highway would cross the tracks without having a clear view of approaching trains. Even though it was assumed that maintaining the crossing in this manner produced a risk, the Iowa Court held that it was not a negligent one. That decision is explainable on the basis that it was rendered in a horse and buggy era during which traffic was negligible and the social value of allowing a railroad to thus intersect the highway far outweighed other considerations. The possibility of intersection impact was then remote, and it was not reasonable to require railroads to protect crossings. The value to society of operating a railway at minimum expense outweighed the magnitude of the risk created by the relationship of the highway and the railroad tracks. Not

so in the case at bar. The crossing here in question was located not in open country but in highly congested environs of the City of Denver. Traffic is no longer horse and buggy in character. It is heavy and it increases every day. The conditions are such that the railroad was not justified in maintaining a constant calculated risk by operating at a speed of 60 miles per hour with negligible safety precautions at this urban intersection. As suggested by the trial judge, the only value to the railroad (and to the Public) was a time gain of at most a few minutes, but even this could be preserved and the hazard reduced to a reasonable level by relatively small modifications at the crossing. Steps could have been and could now be taken to regulate traffic and to make the crossing reasonably safe. For example, the signals could have been activated at one mile instead of one-half mile distance. This would have provided motorists with 30 seconds additional time within which to avoid the crossing. Thus it must be concluded that the magnitude of the risk in this case far outweighed its utility. The risk was therefore unreasonable in law and it follows that the trial judge was justified in concluding from the presented facts that the railroad was guilty of negligence.

The observation in the majority opinion that speed was unimportant in the happening was, of course, the position of the railroad. The majority opinion states:

" * * * Even if the engine had been going only ten miles per hour, it would collide with an object on the track just as certainly as if going one hundred miles per hour. * * * "

This observation fails to consider the highly important time element. The trial court's finding and conclusion that given a few more seconds the plaintiff could have effectively extricated himself furnishes a conclusive answer. The plaintiff was shown to have tried with diligence to escape until time ran out on him. It is reasonable to conclude that a train speed of 30 miles per hour

would have allowed him sufficient time to have cleared the tracks. In any event, it would have increased his chances and thus it is no answer to say that speed of the train was not a cause.

It may be possible to draw a set of inferences such as those adopted by the majority of the Court. As shown above, however, it is also possible to draw contrary inferences and that being so, it seems to me that the judge's conclusions must be upheld. It is possible that the plaintiff could have avoided the accident by either avoiding the crossing altogether or by backing up, which latter course of action the trial court found impractical. Undoubtedly his conduct was one of the causes, but in my opinion it was a non-tortious cause. I do not believe that a fair reading of the record and a detached analysis of the facts permits the conclusion that the plaintiff was imprudent as a matter of law. With all due deference to my learned colleagues who have reached a contrary conclusion, I am of the firm opinion that the judgment of the district court should be affirmed.

MR. CHIEF JUSTICE SUTTON and MR. JUSTICE MOORE join in this dissent.